### UNITED STATES DISTRICT COURT
### DISTRICT OF MAINE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **No. 2:10-cr-197-GZS** |
| | ) | |
| **ALEXANDER MARTINEZ,** | ) | |
| | ) | |
| **Defendant** | ) | |

### RECOMMENDED DECISION ON MOTION TO SUPPRESS

Alexander Martinez, indicted on one count of knowingly and intentionally conspiring with others to distribute, and possess with intent to distribute, a mixture or substance containing cocaine and a mixture or substance containing heroin, in violation of 21 U.S.C. §§ 846 and 841(a)(1), *see* Indictment (ECF No. 3), moves to suppress all statements that he made to law enforcement officials on April 26, 2012, and thereafter, *see* Motion To Suppress Evidence ("Motion") (ECF No. 29) at 1.  An evidentiary hearing was held before me on January 17, 2013, during which the defendant appeared with counsel and had the assistance of a Spanish-language interpreter.  The government tendered two witnesses and three exhibits, all of which were admitted without objection.  The defendant called one witness, himself.  After both sides rested, counsel for each argued orally.  I recommend that the following findings of fact be adopted and that the Motion be denied.

### I.   Proposed Findings of Fact

In 2009 and 2010, Paul Buchanan, a special agent assigned to the United States Drug Enforcement Agency ("DEA") in Portland, Maine, for the past 13 years, participated in an undercover drug investigation that culminated in the return of the instant indictment against the defendant on December 15, 2010.  *See* ECF No. 3.  As part of the investigation, the DEA

wiretapped phones, recording alleged drug transactions that included drug purchase orders made by Buchanan, acting in an undercover capacity, to a person believed to be the defendant, as well as other conversations between the person believed to be the defendant and other individuals.

In April 2012, with the assistance of United States Immigration and Customs Enforcement ("ICE"), the DEA learned that the defendant was detained awaiting deportation at an immigration detention facility, the Stewart Detention Facility in Lumpkin, Georgia. Buchanan made arrangements to travel to Georgia and take the defendant into custody on a federal warrant for his arrest.  Prior to departing, Buchanan transferred several audio recordings made during the wiretaps onto a compact disc ("CD") to play to the defendant if the defendant chose to speak with him, which he hoped would be the case.

Buchanan traveled to Georgia, rented a vehicle, met with a fellow DEA special agent, Fred Collins, in Columbus, Georgia, and drove with Collins to the Stewart facility on April 26, 2012.  Buchanan and Collins temporarily surrendered their service weapons at a security gate at the entrance to the facility's central courtyard, then drove through and parked in the courtyard.

Buchanan knew, from his participation in the investigation that led to the defendant's indictment, that the defendant knew only very basic English.  Buchanan knew little Spanish. Therefore, upon entering the Stewart facility, he asked a supervisor whether someone there could serve as a Spanish-language interpreter in the event that the defendant agreed to speak with him. The supervisor arranged for Cesar Ciprian, an ICE deportation officer who had worked at the Stewart facility since 2007 and was a native Spanish speaker, to assist Buchanan.  Ciprian, whose duties at the Stewart facility included arresting suspected violators of immigration laws and who had previously assisted law enforcement agents from other agencies, was familiar with *Miranda* warnings.  The supervisor told Buchanan that, once the DEA agents left the security

gate at the entrance to the facility, Ciprian would meet them in a parking lot outside to provide translation services if the defendant agreed to speak with Buchanan.

Buchanan and Collins waited inside the facility for about 45 minutes while paperwork was processed incident to the transfer of custody and the defendant was brought out.  Buchanan and Collins then took custody of the defendant, handcuffed him, and led him outside to Buchanan's rental car in the facility's central courtyard.  The defendant asked Buchanan what this was all about, and Buchanan said that he would explain once they got outside of the facility. No other conversation transpired at that time.

Buchanan and Collins placed the defendant in the rental car, drove to the security gate, where they retrieved their weapons, one at a time, and drove into the parking lot beyond the central courtyard.  Buchanan concealed his weapon in a holster under his shirt, and Collins concealed his weapon as well.  About 10 or 15 minutes had elapsed since the agents had taken the defendant to the car.  Ciprian was waiting in the parking lot outside of the gate.  Buchanan stopped the car.  Collins got out, and Ciprian got in.  The defendant was in the front passenger seat next to Buchanan, and Ciprian sat in the back seat, behind the defendant.  Buchanan could not locate his *Miranda* card and asked Collins if he had one.  Collins retrieved one from his belongings in the trunk of the car and handed it to Buchanan.  Collins then stood outside the car and did not participate in the interview.  Prior to meeting with Ciprian, Buchanan conducted no interview of the defendant and played no audio recordings for him.

Buchanan asked Ciprian to read the defendant his *Miranda* rights in Spanish, and Ciprian did so.  The defendant, who was familiar with *Miranda* from prior arrests, answered the *Miranda* questions, and Ciprian told Buchanan in English that the defendant had agreed to speak with him.  Buchanan identified himself and explained why he had placed the defendant under arrest –

that he was the target of an investigation of drug distribution between Massachusetts and Maine and was associated with William Mejia, another target of the investigation.

Buchanan then told the defendant, through Ciprian, that he wanted to play some phone calls.  He played a drug-related phone conversation, using the rental car's CD player, and asked the defendant if he could identify the voices.  The call was either all in Spanish, or in a mix of Spanish and English.  The defendant identified one voice as that of William Mejia, and said the other voice sounded like his own.  Buchanan then asked the defendant what the call was.  The defendant responded, through Ciprian, that he did not sell drugs but merely answered phones and sent someone else to deliver the drugs.  He stated, through Ciprian, that he wanted to talk to a lawyer and that, once he did so, he would again speak with Buchanan and straighten this out.  The interview, to that point, had lasted approximately 10 to 15 minutes.  Buchanan had employed a normal conversational speaking tone throughout.

Buchanan stopped the interview, Ciprian exited the car, and Collins got back in.  Buchanan and Collins then drove the defendant to a federal courthouse in Columbus, Georgia, where he was scheduled to make an initial appearance.  Buchanan had not had the opportunity to ask most of the questions that he wanted to ask; he estimates that the interview could have gone for several hours, had the defendant wished to continue talking.  Buchanan asked the defendant no questions during the ride to the courthouse, and the defendant slept during much of it.  Even had Buchanan wished to interview the defendant at that time, the language barrier between them would have prevented a conversation.

Buchanan did not tape his interview of the defendant, nor is it his normal practice to do so.  He did not write a report of the interview until September 2012, mistakenly believing that he

had earlier written a report.  He used contemporaneous notes to write the September 2012 report and then destroyed those notes.

Buchanan, who has been a law enforcement officer for a total of about 21 years, including eight years as an immigration inspector prior to his employment with the DEA, has participated in many arrests and conducted many interviews of witnesses and suspects.  He has given *Miranda* warnings at least 100 times.  His habit and practice is to read *Miranda* warnings, or have them read in the appropriate language, prior to any questioning whenever he wishes to interview someone who has been placed under arrest.  He does not rely on his memory, but rather reads the warnings from a card, the DEA Form 13-A, which sets them forth in English on one side and Spanish on the other.[1]

---

[1] The defendant testified that, when Collins exited the rental car in the parking lot outside of the security gate, only he and Buchanan were in the car, and Buchanan interviewed him in English, showing him photographs, playing excerpts of audio recordings, all of which were in English, and asking him questions about those.  He testified that he had difficulty understanding Buchanan, although he did understand that Buchanan was asking him to identify people in the photographs and voices on the tapes.  According to the defendant, this questioning lasted only about three to five minutes.  The defendant testified that, during this time, Ciprian was standing about three meters away from the car talking to another officer, and Buchanan did not call him to get into the car until after Buchanan had asked the defendant the questions about the photographs and the audio recording excerpts.  He stated that Buchanan then asked Ciprian to explain to him who Buchanan's client was and to inquire whether he understood why he was under arrest.  He testified that Buchanan procured a *Miranda* rights card from the trunk, which Ciprian read to him in Spanish, whereupon he (the defendant) stated that he would talk, but only in front of a lawyer.  The defendant testified that Ciprian then spoke to Buchanan and got out of the car, and that was the end of the interview.  He stated that he was sure that Ciprian did not read him *Miranda* warnings until after Buchanan played the audio recordings.  I do not credit this testimony.  First, it strains credulity that Buchanan, an experienced law enforcement agent, would have gone to the trouble to arrange for Ciprian's services as a translator and then have proceeded to interview the defendant in English as Ciprian stood idly by.  Second, Buchanan testified that it is his habit and practice to read *Miranda* rights before interviewing a suspect who is under arrest.  Third, Buchanan testified on cross-examination that he was "absolutely sure" that he did not play the audio recordings or ask questions before *Miranda* warnings were read, and that his memory on this point was "clear and distinct."  Fourth, although Ciprian's memory was foggy on some points, such as whether he read *Miranda* warnings and whether the defendant invoked his right to a lawyer, he was clear that he entered the rental car outside of the security gate, performed translation services for about 10 or 15 minutes, and was present while audio recordings were played.  Fifth, if Buchanan had been intent on engaging in improper conduct to obtain the defendant's confession, there would have been no reason for him to shut down the interview after obtaining very little information as soon as the defendant invoked his right to an attorney, as even the defendant agrees that he did. Sixth, and finally, the defendant has a history of using falsehoods to suit his purposes.  He admitted on cross-examination that he has used false names during a court appearance, while applying for a driver's license, and while attempting to rent an apartment, has used a false Social Security card, a false birth certificate, and a false driver's license from Puerto Rico, and has falsely told law enforcement officers that he was Puerto Rican.  *See also* Gov't Exhs. 2, 4-5.

## II. Discussion

The defendant seeks to suppress the statements he made to Buchanan on April 26, 2012, on the bases that Buchanan (i) elicited those statements after he was taken into custody without first administering the warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966),[2] (ii) failed to immediately cease questioning him after he invoked his right to counsel, in further violation of his rights, and (iii) elicited his statements involuntarily by questioning him in English, knowing that he has difficulty with the English language.  *See* Motion at [2]-[7].  He argues that any statements that he made following any of these violations should be suppressed as fruits of the transgression of his rights.  *See id.* at [7].

The government bears the burden of proving the voluntariness of a confession, *see, e.g., United States v. Jackson*, 918 F.2d 236, 241 (1st Cir. 1990), as well as compliance with the dictates of *Miranda*, *see, e.g., United States v. Barone*, 968 F.2d 1378, 1384 (1st Cir. 1992), which include the directive that, following a suspect's unambiguous invocation of the right to an attorney, police must cease questioning him or her until an attorney is present, *see, e.g., United States v. Olsen*, 609 F. Supp. 1154, 1158 (D. Me. 1985).

For the reasons that follow, I conclude, and recommend that the court find, that the government has met its burden with respect to each of the defendant's points.  Accordingly, I recommend that the Motion be denied.

---

[2] Pursuant to *Miranda*, an accused must be advised prior to custodial interrogation "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."  *Miranda*, 384 U.S. at 478-79.

### A.  Asserted Failure To Give *Miranda* Warnings

"*Miranda* warnings must be given before a suspect is subjected to 'custodial interrogation.'"  *United States v. Taylor,* 985 F.2d 3, 7 (1st Cir. 1993) (citation omitted).  The government does not dispute that the defendant was subjected to custodial interrogation or that *Miranda* warnings were required prior to that interrogation.  *See* Government's Response in Opposition to Defendant's Motion To Suppress ("Response") (ECF No. 32) at [3].  However, it contends that Buchanan administered the required warnings before commencing any interrogation.  *See id.*  As noted above, I find Buchanan's testimony on this matter credible.  Should the court agree, that is dispositive of this point.

### B.  Asserted Failure To Cease Questioning After Invocation of Right to Counsel

In *Edwards v. Arizona,* 451 U.S. 477 (1981), the Supreme Court held that law enforcement officers must immediately cease questioning of a suspect who clearly asserts his or her right to have counsel present during interrogation.  *See Edwards,* 451 U.S. at 484-85.  *See also, e.g.*, *United States v. Libby*, No. CRIM. 04-26-B-W, 2004 WL 1701042, at *6 (D. Me. July 30, 2004) (rec. dec., *aff'd* Sept. 27, 2004) ("If a defendant subjected to custodial interrogation unequivocally invokes his right to counsel, all questioning must cease.  To activate the prohibition on continued questioning, however, the request for counsel must be unambiguous.") (citations omitted).

The government does not dispute this proposition, but argues that Buchanan did immediately cease questioning once the defendant invoked his right to counsel.  *See* Response at [3].  I have recommended that the court find that this was so.  In this scenario, Buchanan did not violate the defendant's rights by failing to cease questioning upon his invocation of his right to counsel.

### C. Asserted Elicitation of Involuntary Confession

Involuntary confessions violate the due-process clauses of the Fifth and Fourteenth amendments. *See, e.g., United States v. Genao*, 281 F.3d 305, 310 (1st Cir. 2002). In the face of a defendant's claim that his confession was extracted involuntarily, the government bears the burden of showing, based on the totality of the circumstances, that investigating agents neither "broke" nor overbore his will. *Chambers v. Florida,* 309 U.S. 227, 239-40 (1940). As this language suggests, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary[.]'" *Connelly,* 479 U.S. at 167. *See also, e.g., Rice v. Cooper*, 148 F.3d 747, 750 (7th Cir. 1998) ("A confession or other admission is not deemed coerced or involuntary merely because it would not have been made had the defendant not been mentally defective or deranged. The relevant constitutional principles are aimed not at protecting people from themselves but at curbing abusive practices by public officers.") (citation omitted).

The government denies that Buchanan employed the tactic of deliberately asking the defendant questions in English to confuse him and overcome his will, *see* Response at [3], arguing that, to the contrary, Buchanan arranged for the services of a Spanish interpreter, Ciprian, whose services he employed throughout the questioning, *see id*. at [1]-[2]. For the reasons discussed above, I recommend that the court find as a fact that Ciprian, at Buchanan's request, translated all questions asked by Buchanan into Spanish for the defendant, and translated the defendant's responses into English for Buchanan. In that scenario, the defendant's confession was not coerced in violation of his Fifth and Fourteenth amendment rights.

### III. Conclusion

For the foregoing reasons, I recommend that the defendant's motion to suppress be **DENIED**.

## *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof.  A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 14th day of February, 2013.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge